IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

WENDY BLADES,
Plaintiff,

v.

Case No. 18–CV–01369–JPG

J & S PROFESSIONAL PHARMACY, INC.
and
JOYCE FOGLEMAN,
Defendants.

### MEMORANDUM & ORDER

This is a sexual-harassment case. Before the Court is Defendants J & S Professional Pharmacy, Inc. ("J & S") and Joyce Fogleman's Motion for Summary Judgment. (ECF No. 37). Plaintiff Wendy Blades responded, (ECF No. 41); and the defendants replied, (ECF No. 46). For the reasons below, the Court **GRANTS IN PART AND DENIES IN PART** the defendants' Motion. Specifically, the Court:

- **DENIES** summary judgment on Counts I through VII;
- **GRANTS** summary judgment on Count VIII; and
- **DISMISSES** Count VIII **WITH PREJUDICE**.

### I.   PROCEDURAL & FACTUAL HISTORY

J & S is an independent pharmacy in West Frankfort, Illinois. (Fogleman Dep. 20, 45, ECF No. 37-4). Fogleman, the pharmacist-in-charge, has owned it since 1988. (*Id.* at 20). It has about 20 full-time employees. (*Id.* at 23).

Fogleman is responsible for the day-to-day management of the pharmacy, with sole authority to hire, fire, and discipline employees. (*Id.* at 26). Below her is Judi Markwell, her sister

and administrative assistant, who mainly deals with the business side of things: "She doesn't have the power to fire." (*Id.*).

In 2004, Fogleman hired Blades as a pharmacy technician. (*Id.*). Blades is married and has one child. (Blades Dep. 6, ECF No. 37-2). Fogleman is "strictly homosexual," has no children, and is in a committed relationship. (Fogleman Dep. at 10). In her 13 years at J & S, Blades was never once disciplined or written up. (*Id.* at 36; Blades Dep. at 11).

Employees at J & S receive a competitive compensation package. For example, they participate in a profit-sharing plan in which J & S makes 100 percent of the contributions. (Fogleman Dep. at 60–61). J & S also pays 100 percent of its employees' health-, dental-, and vision-insurance premiums. (*Id.* at 64). They get three weeks paid vacation, six paid holidays, and a paid birthday off each year as well. (*Id.* at 64–65). On top of that, J & S has sponsored paid vacations across the country, including trips to Nashville, Memphis, New Orleans, Las Vegas, St. Louis, and Notre Dame Stadium in South Bend. (*Id.* at 66). Fogleman even took three employees on an all-expense-paid trip to Europe in 2014 when they reached their 20-year work anniversary. (*Id.* at 68–69). She promised the same to Blades for her anniversary in 2024. (*Id.*).

Aside from the generous benefits and vacations, the work environment at J & S was hardly ordinary. On payday, for example, Fogleman hand-delivered checks to each employee in a ceremony she called "graduation":

> [A]s I was speaking their name, we would shake hands with the right hand. I would hand them the paycheck. And then I would purse my lips and lean in. They had to come meet me. I didn't just reach over and give them a kiss. Purse my lips to complete the graduation ceremony.

(*Id.* at 95). Although Fogleman described it during her deposition as a mere "pecker" that was "not wet," (*id.* at 98–100), Blades described it as a wet kiss, (Blades Dep. at 75). Fogleman also stated

— 2 —

that Blades always met her halfway, (Fogleman Dep. at 89), while Blades said that Fogleman insisted on kissing her on the lips, even when rebuffed by a turn of the cheek, (Blades Dep. at 69). Blades also testified that Fogleman once stripped naked and ran a lap around the (closed) pharmacy on a self-dare. (Blades Dep. at 76). Fogleman admitted that much. (Fogleman Dep. at 153, 176). But she denied ever flashing her privates at J & S holiday parties—at least within the last five-to-ten years. (Fogleman Dep. at 172). She also generally denied ever exposing herself to customers, including Blades's claim that she "pulled down her pants and her underwear and bent over to [a] customer" parked at the drive-thru window "out of the blue" because "[s]he thought it was funny." (*See* Blades Dep. at 86–89; Fogleman Dep. at 166, 169). That said, she admitted revealing a "plumber's crack"—two-to-three inches of her bare behind—"in jest . . . to a customer that was taunting [her] in some way like that." (Fogleman Dep. at 167). All in all, Fogleman did not believe that exposing herself in the workplace was objectionable because "it was just like a family setting." (*Id.* at 180).

Over time, Fogleman and Blades developed an unconventional relationship. According to Blades, Fogleman asked her to hold hands many times. (Blades Dep. at 63). Fogleman also kissed Blades randomly throughout the workday: "I could be going to get a soda, and she could just be coming into work. And she kisses you. I didn't know when it was going to happen." (*Id.* at 74). At least twice per week, Fogleman would wrap an arm around Blades's right side and grab the fat below her breast. (*Id.* at 65–66). Blades never objected, though she assumed Fogleman "knew [she] was uncomfortable" based on her body language. (*Id.* at 66).

Other employees had differing opinions about the environment at J & S. One said she "never felt offended or felt that [Fogleman] was being inappropriate in any way." (Mortag Dep. at 88). She also revealed that it was her understanding that Blades's "husband stopped going to

[J & S] Christmas parties because he did not want to be subjected to Joyce exposing herself." (*Id.* at 80). In Markwell's 20 years at J & S, she never received "a complaint from anybody . . . over any party issues, over the streaking issue or over kissing for paychecks." (Markwell Dep. at 112). Another employee said that since starting at J & S in 1994, he was unaware "of anyone else who has claimed that the actions of Joyce in doing those things, the kissing of employees, the spanking of employees, the nudity, those type of things, that those were inappropriate." (Heyder Dep. 13, 72, ECF No. 37-6).

Blades was diagnosed with high blood pressure in 2014: "You could tell when . . . my blood pressure was up. My face would get flushed. My ears would turn bright red. So [Fogleman] knew of my condition." (*Id.* at 49). Blades's blood pressure "was always talked about. . . . It was kind of like a known thing in the pharmacy." (*Id.* at 53; *see* Moschino Dep. 48, ECF No. 37-9; Mortag Dep. at 50; Triplett Dep. 75, ECF No. 37-11; Fogleman Dep. at 200). Fogleman would sometimes measure her blood pressure throughout the day: She was once so concerned about Blades's blood pressure that she went to Blades's home after work to measure it. (*Id.*).

Over the years, Blades's family urged her "to look for other employment, because [her] health [was] just getting worse." (Blades Dep. at 12).

> The sexual behavior gave me—it gave me anxiety. . . . I dreaded every day going in to work and not knowing what was going to happen. And not knowing what she was going to—bizarre behavior she was going to come up with.

(*Id.* at 109). They told her that "Joyce's behavior wasn't going to change," (*id.* at 108), and that she "owed it to them to at least try to find another job," (*id.* at 12). So in 2017, she did, applying for a position at a nearby hospital. (*Id.*).

Fogleman did not react well to the news:

> Q. What did you say?
>
> A. I went into her office, and I told her I thought this was about applying for the job. She wasn't aware of me applying for the job. And I said yes. And she then began to get on the floor and rock in a fetal position. And she said, "You promised you would never leave me." And she said, "Will you please turn the lights off and leave me alone?"
>
> Q. Okay. Anything else said?
>
> A. I left.

(*Id.* at 13). According to Fogleman:

> The reason I fell on the floor was I had known about this for six weeks, but the others did not want me to let Wendy know. So this was an earth-shaking admission that she was looking for another job. As far as Wendy knew, that was the first that I had heard. . . . So I wanted it to be an exclamation of surprise.

(Fogleman Dep. at 217–18).

Business continued without major interruption for over a week—until J & S had its periodic after-hours inventory check. (*Id.* at 247; Blades Dep. at 14–15). Blades considered the inventory check one of her job duties. (Blades Dep. at 14). Fogleman, however, worried about losing Blades and other employees, decided she "better start training new people to do this." (Fogleman Dep. at 247).

Blades felt slighted when Fogleman asked her not to participate in the inventory check. (Blades Dep. at 15).

> Wendy was very upset and her face started turning red . . . . And then it was probably ten minutes later, or maybe more, . . . she went over to the doctor's office to have them take her blood pressure.

(Mortag Dep. at 88–90; *see* Triplett Dep. at 99–103). The doctor's office was across the hall. (Blades Dep. at 19). When she returned, Blades informed the coworker that her blood pressure

was dangerously high and that she was leaving work early to rest. (Mortag Dep. at 91). The coworker later told Markell that Blades left "for health reasons." (Markwell Dep. at 145–46).

A few days after, Fogleman sent a text message to Blades requesting a meeting. (Fogleman Dep. at 271–72). On one hand, Fogleman "intended to discuss . . . whether [Blades] was going to stay or go." (*Id.*). On the other, she wanted to address her perception that Blades "always, or a lot of times, needed to be in conflict with someone." (*Id.* at 240). Fogleman suggested during her deposition that Blades's troubled marriage was behind her desire to leave:

> [Blades] thought [her husband] was a wuss because of his police job, he was nervous about the police scene. And she wasn't pleased with that. . . . [A]ll he wanted to do was go fishing. And then Wendy started to say, I wish Chad was dead. I wish I could just go home and he would be dead on the floor, wish he was dead. And she was going to kill him with snake venom . . . because there was no trace.

(*Id.* at 240–41).

Fogleman and Blades made plans for the following evening, but the meeting never happened. (*Id.* at 278). Instead, Markwell approached Blades at J & S and asked to speak with her privately. (Blades Dep. at 19). According to Blades, Markwell told her she had an attitude problem and that if she walked out, then she would be fired. (*Id.* at 15, 20). Markwell then left the office to give Blades time to calm down. (*Id.* at 20). She never did:

> I sat there for a long time, and I couldn't calm down. I went across the hall where my doctor's office was. And she took my blood pressure. She said, "You have to calm down. You have to sit down and calm down. Your blood pressure is high." And so I went back and sat down.
>
> I then called my father on the phone in the office. And I said, "Judi told me that if I leave today, I'm fired. And my blood pressure is high, and I can't go back to work." He said, "Leave then. You have to leave." And so I left. I gathered my things. I told Judi I was leaving. I just said, "Bye." And I left.

(*Id.* at 19–20). On her way out, she told a coworker, "I quit." (Moschino Dep. at 51). And later, Blades sent a text message to Fogleman stating, "I just got fired. I hope your [sic] happy." (Text from Blades to Fogleman, ECF No. 37-5). Fogleman responded with, "As I understand it, the decision was up to you. You were welcome to stay. . . . [W]e all wanted that, but if you walked out, you quit." (Text from Fogleman to Blades, ECF No. 37-3 at 6).

In the days to follow, Blades voiced her frustration to a coworker: "In 13 years, [I've] never even been wrote up, [I] get along with everyone, love the customers, loved everything. . . . I tried to explain to her, [I] didn[']t apply for the job because [I] was unhappy." (Text from Blades to Adkins, ECF No. 37-3 at 42). Blades also noted, "You know, I would have never quit my job, I've been there 13 years." (*Id.* at 46).

Blades maintained contact with Fogleman even after her departure. In a series of text messages, she told Fogleman, "You didn[']t treat me bad ever. You just really hurt my feelings. . . . Who knows we m[a]y turn out to be [best friends] now that we don't work together." (Text from Blades to Fogleman, ECF No. 37-3 at 19, 22). When Fogleman told Blades that she never realized that they had a poor relationship, Blades clarified that "[i]t never was [bad], just the last few days." (*Id.* at 22). By the end of the conversation, Blades said, "I wish I could just give you a hug! I know it sounds cheesy! . . . I just needed us to make up!" (*Id.* at 27). Days later, Blades sent Fogleman a spontaneous message in German: "Ich vermisse dich!!!"—*I miss you*.[1] (*Id.* at 29).

Even so, Blades sued J & S and Fogleman in this Court in 2018. (Am. Compl. 1, ECF No. 26). She alleges violations of Title VII, the Illinois Human Rights Act (or "IHRA"), state common law, and the Americans with Disabilities Act (or "ADA"). (*See id.*). J & S and Fogleman moved for summary judgment. (Defs.' Mot. for Summ. J. 1, ECF No. 37).

---

[1] *Ich Vermisse Dich*, Google Translate (last visited Oct. 21, 2020), https://translate.google.com/#view=home&op=translate&sl=auto&tl=en&text=Ich%20vermisse%20dich.

## II. JURISDICTION

Federal courts have original jurisdiction in cases arising under federal law. 28 U.S.C. § 1331. They also "have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id.* § 1367.

The Court has original jurisdiction here given Blades's claims under Title VII and the ADA, both of which are federal statutes. The Court also has supplemental jurisdiction over her state-law claims because they share the same operative facts as the federal claims. Subject-matter jurisdiction in this Court is therefore proper.

## III. LAW & ANALYSIS

Factual disputes largely preclude summary judgment, particularly whether Blades found Fogleman's behavior subjectively offensive. This conflict alone makes summary judgment inappropriate on Counts I through VII. That said, dismissal of Count VIII is appropriate, as Blades failed to establish that she suffered an adverse employment action *because of* her high blood pressure.

### A. Legal Standard

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accepts its version of events." *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 therefore "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A motion for summary judgment can be supported by "citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, . . . or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). That said, differences in the litigants' version of the facts "do not preclude summary judgment . . . unless they are material to the outcome." *Kiess v. Eason*, 442 F.2d 712, 713 (7th Cir. 1971). "[T]he judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### B. Count I: Title VII Claim Against J & S

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.' " *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 62 (1986) (quoting 42 U.S.C. § 2000e-2(a)). "[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). It follows that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor*, 477 U.S. at 66.

If the harassing supervisor is high enough in the management of a corporate employer, then his actions are attributable to the corporation because he acted as its alter ego. *See Burlington Indus., Inc. v. Ellert*, 524 U.S. 742, 758 (1998). Title VII also does not distinguish between male

and female employees, either as victims of sexual harassment or as perpetrators. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78–80 (1998).

Tangible economic loss is not required to secure relief under Title VII: The plaintiff need only prove that the sexual advances and comments were unwelcome and were "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor*, 477 U.S. at 67 (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982)).

> Conduct that is not severe or pervasive enough to create an **objectively** hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not **subjectively** perceive the environments to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (emphasis added).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Oncale*, 523 U.S. at 23. Generally, inappropriate physical touching is considered more severe than mere verbal behavior; and the severity will depend on the nature of the touching. *See Turner v. Saloon, Ltd.*, 595 F.3d 679, 685–86 (7th Cir. 2010). The Court "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000). "[H]arassing conduct does not need to be both severe and pervasive. One instance of conduct that is sufficiently severe may be enough." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (internal citations

omitted). With that in mind, this question often "presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor*, 477 U.S. at 68.

The defendants argue that Fogleman's actions were motherly. Fogleman testified that, as someone without children of her own, she views her employees as "family." (Fogleman Dep. at 12, 23). In her mind, J & S is a team environment: Her sportsman's slaps were congratulatory, not predatory; and "graduation" aimed to show appreciation, not sexual desire. Naturally, Blades disagrees: "Harvey Weinstein could not have concocted a more bizarre, or less credible defense." (Blades' Mem. in Opp. 1, ECF No. 41).

As for the *objective* requirement, the Court agrees that a reasonable person in Blades's position would find the work environment to be objectively abusive. True enough, some J & S employees testified that they did not find Fogleman's behavior inappropriate. But it is *never* appropriate for an employer to expose herself in front of her employees, even in jest. Butt smacking, kissing on the lips, mooning—that behavior is unacceptable in the workplace, no matter if there are sexual undertones attached.

That said, a genuine dispute of material fact exists as to whether Blades found the environment *subjectively* abusive: The record suggests that Blades and Fogleman had a close friendship. Blades seemingly confided with Fogleman about her relationship issues. And in the days following her departure,[2] Blades sent Fogleman text messages indicating how they might become best friends now that they are not coworkers, how it was never bad and she loved everything about the job, and how much she missed her. Although "the fact that sex-related conduct was 'voluntary,' in the sense that the [Blades] was not forced to participate against her

---

[2] As discussed, liability under Title VII does not require a tangible employment action: Harassment is actionable so long so long as it is has the "effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a) (1985). Whether Blades quit or was fired is therefore immaterial.

will, is not a defense," it may still help clarify "whether [Blade's] conduct indicated that the alleged sexual advances were unwelcome." *See Meritor*, 477 U.S. at 68. Relatedly, Blades suggests that even though she did not voice her discomfort, Fogleman should have inferred as much based on her body language. This factual dispute is best left for a jury to resolve after hearing testimony from witnesses and gauging their credibility.

The Court therefore **DENIES** summary judgment on Count I.

### C. Counts II & III: IHRA Claims Against J & S and Fogleman

The Illinois Human Rights Act also prohibits employers from engaging in sexual harassment. 775 Ill. Comp. Stat. § 5/2-102(D) (1992).

> "Sexual harassment" means any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when . . . such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

*Id.* § 5/2-101(E).

The Supreme Court's Title VII jurisprudence "should be applied to sexual harassment claims pursuant to the Act," including the objective-subjective test discussed above. *Trayling v. Bd. of Fire & Police Comm'rs*, 652 N.E.2d 386, 394 (Ill. App. Ct. 1995). As a result, the same factual disputes that preclude summary judgment on Count I also preclude summary judgment on Counts II and III.

The Court therefore **DENIES** summary judgment on Counts II and III.

### D. Counts IV & V: Battery Claims Against J & S and Fogleman

"[T]he civil tort of battery . . . in its simplest terms, is defined as 'the unauthorized touching of the person of another.'" *Wilson v. City of Chicago*, 758 F.3d 875, 879 (7th Cir. 2014) (quoting *Curtis v. Jaskey*, 759 N.E.2d 962, 964 (Ill. App. Ct. 2001)).

That said, the IHRA preempts tort claims that are " 'inextricably linked' to a civil rights violation such that there is no independent basis for the action apart from the Act itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 517 (Ill. 1997); *see* 775 Ill. Comp. Stat. § 5/8-111(D). They are not preempted, however, if the plaintiff can establish its elements "independent of any legal duties created by the Act." *Maksimovi*, 687 N.E.2d at 22. Put differently, when "the sexual harassment aspect of the case is 'merely incidental to what are otherwise ordinary common law tort claims,' the claim is not preempted." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 603 (7th Cir. 2006) (quoting *Maksimovic*, 687 N.E.2d at 23). That is the case here, where Blades can state a claim for battery regardless of the employment relationship.

As discussed, however, a factual dispute exists about the existence and validity of Blades's consent. According to Blades, she turned her cheek to kisses and shuttered whenever Fogleman grabbed her waist or behind. To her, that was enough to put Fogleman on notice that she did not want to be touched. But to Fogleman—who never heard Blades complain about her touching in 13 years, was always met halfway for her payday peck, and regularly checked Blades's blood pressure—there was no *unauthorized* touching. Like the factual dispute precluding summary judgment on Count I, a jury will be tasked with weighing the disputed evidence and deciding which is more probative.

The Court therefore **DENIES** summary judgment on Counts IV and V.

### E.  Counts VI & VII: IIED Claims Against J & S and Fogleman

"Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress ["IIED"] only if she establishes that: '(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's

conduct did cause severe emotional distress.' " *Naeem*, 444 F.3d at 604–605 (quoting *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997)).

Like battery claims, IIED claims are not preempted by the IHRA when the employer's conduct is more than "just sexually harassing conduct; . . . rather behavior that would be a tort no mater what the motives of the defendant." *Id.* at 605. Again, Blades's IIED claim is even stronger because Fogleman was also her employer; but Blades's ability to state a claim for IIED is not reliant on the employment relationship.

That said, the litigants dispute whether Fogleman knew that it was highly probable that her conduct would lead to severe emotional distress. To be sure, Fogleman's conduct, if true, is intolerable in any workplace in this civilized society. But in 13 years, Blades never openly complained about Fogleman's behavior; nor is there any indication that *any* employee did. A factual question thus arises involving the extent of what Fogleman's intended or knew might happen.

The Court therefore **DENIES** summary judgment on Counts VI and VII.

### F. Count VIII: ADA Claim Against J & S

The Americans with Disabilities Act prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

> Where there is no direct evidence of disability discrimination, a plaintiff may prove his case indirectly by employing the burden-shifting approach set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Under the *McDonnell Douglas* method of proof, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. . . .

> In order to establish a *prima facie* case of disability discrimination under the ADA, [the plaintiff] must show (1) that he is a qualified individual with a disability, (2) that his work performance met [the employer's] legitimate expectations, (3) that he suffered an adverse employment action, and (4) that his disability was the motivation for the adverse employment action.

*Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (internal citations and quotation marks omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Summary judgment is appropriate on Count VIII because Blades failed to show that she was discriminated against *because of* her high blood pressure. By her own admission, Blades's high blood pressure was generally known by her peers. Her testimony also revealed that Fogleman went out the way to make sure that Blades controlled her blood pressure, including driving to Blades's home after work hours to monitor her numbers. Blades also cannot point to any statements made by Fogleman or Markwell revealing that Blades's departure had something to do with her medical problems. Rather, Blades and Fogleman both acknowledged that the dispute arose when Blades applied for another job. Even though Blades's departure came at time when she was experiencing high blood pressure, there is nothing in the record suggesting that any alleged adverse employment action was motivated, directly or indirectly, by Blades's disability.

The Court therefore **DISMISSES** Count VIII **WITH PREJUDICE**.

## IV.     CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** Defendants J & S Professional Pharmacy, Inc. and Joyce Fogleman's Motion for Summary Judgment. (ECF No. 37). Specifically, the Court:

- **DENIES** summary judgment on Counts I through VII;
- **GRANTS** summary judgment on Count VIII; and
- **DISMISSES** Count VIII **WITH PREJUDICE**.

**IT IS SO ORDERED.**

**Dated: Thursday, October 22, 2020**

<u>**S/J. Phil Gilbert**</u>
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**